# UNITED STATES DISTRICT COURT
# DISTRICT OF MAINE

| | |
|---|---|
| MR. and MRS. DOE, individually and as parents of JANE DOE, a minor, | ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) Civil No. 2:13-cv-00407-JDL ) |
| CAPE ELIZABETH SCHOOL DEPARTMENT, | ) ) |
| Defendant. | ) |

## ORDER ON PLAINTIFFS' APPEAL OF
## THE ADMINISTRATIVE HEARING OFFICER'S DECISION

In this action, the plaintiffs, Mr. and Mrs. Doe ("Jane's parents" or "the Does"), request that the court vacate a Due Process Hearing Officer's decision under the administrative procedures of the Individuals with Disabilities in Education Act ("IDEA" or "the Act"), 20 U.S.C. § 1415(i)(2). For the reasons stated below, I find that the Hearing Officer's decision should be affirmed.

## I. FACTUAL BACKGROUND

After careful review of the hearing record, I adopt the facts that are set forth in detail in the Due Process Hearing Officer's decision, dated October 15, 2013, *see* R. 152-175, and which are summarized here.

The Does bring this appeal on behalf of their fifteen year-old daughter, "Jane," who is in the tenth grade at Cape Elizabeth High School and who has received special education services related to her reading skills for most of her childhood. ECF No. 26 at 2; R. 153. In Jane's third grade year, a school district psychologist, Dr. Alina

Perez-Smith, evaluated Jane and diagnosed her with a reading disorder, describing her abilities as "typical of dyslexic individuals." R. 154. Shortly thereafter, Jane's IEP Team concluded that Jane qualified as a student with a disability under the IDEA. R. 155.

In December 2012, the defendant, Cape Elizabeth School Department ("Cape Elizabeth" or "the school district") conducted a triennial reevaluation of Jane which consisted of a psychological evaluation performed by Laura Manuel, a school psychologist; an academic evaluation performed by Tammy Thatcher, a special education teacher; and interviews with Jane's teachers and parents. R. 164, 510. The results of Manuel's psychological evaluation and Thatcher's academic evaluation showed that Jane achieved "average or higher scores" on a battery of tests, with one exception: Jane scored in the "low average" range of the "Rapid Naming Composite" portion of the Comprehensive Test of Phonological Processing ("CTOPP")."[1] R. 510.

---

[1] Jane's performance on the testing that was performed by Manuel and Thatcher is described in the record as follows:

> On the WISC-IV test of cognitive abilities, [Jane's] scores were 108 for verbal comprehension (70th percentile), 99 for working memory (47th percentile), and 115 for processing speed (84th percentile). The first two scores were in the average range, and the processing speed score was high average. On the WMRT-III, a reading test, [Jane] scored in the average to above-average range on all tests, with a standard score of 100, or the 50th percentile, on oral reading fluency, one of [Jane's] area of challenge. Her above average scores were in the reading comprehension cluster, which was one of her areas of strength, where she scored in the 95th percentile. [Jane's] GORT-5 score was a 92, which was the 30th percentile, with a score in the 25th percentile for reading rate . . . . In lieu of the CMS, Ms. Manuel administered the Wide Range Assessment of Memory and Learning (WRAML-2), which she believed was the preferred measure for testing memory for someone [Jane's] age. [Jane's] scores on the WRAML-2, which was comprised of 12 tests, were all in the average range, except that she obtained a high average score in the 79th percentile on visual memory. Her attention/concentration score, although in the average range, was on the low end of that spectrum, in the 27th percentile. For phonological processing, [Jane] was administered CTOPP [the "Comprehensive Test of Phonological Processing"]. Although five years earlier, [Jane]

Jane's IEP Team gathered in January 2013 to review the results of the previous month's triennial reevaluation. In addition to the results of the psychological and academic evaluations administered by Manuel and Thatcher, the IEP Team reviewed Jane's classroom progress and performance; the results of her most recent 2012 NWEA and 2011 NECAP tests, state-mandated standardized tests on which Jane met or exceeded grade level expectations for both reading and math; and input from Jane's parents and teachers. R. 509-10. The IEP Team also noted that Jane was receiving "A" grades in all of her classes. R. 166.

Using the Maine Department of Education Learning Disability Evaluation Report ("LD Document"), and with the above factors in mind, the IEP Team concluded that Jane no longer qualified as a student with a learning disability as defined by the Maine Unified Special Education Regulation ("MUSER"), ME ADC 05-071, Ch. 101, §§ VII.2.L(2)(a) and VII.2.L(2)(c) (2014). R. 504-505 (LD Document dated January 3,

---

demonstrated a weakness [in] phonological awareness, she scored in the average range in that area, with a score of 109, and in the average range for phonological memory and alternate rapid naming. All of her processing scores were average or above except in the area [of] rapid naming, where her score was in the low average range of 82. This is an area of relative weakness for her. To be 1.5 standard deviations below the mean would be a standard score of 78 or below, and a 1.0 standard deviation would be an 85 or below. The Test of Orthographic Competence is an academic test that measures skills in conventions, spelling speed and spelling accuracy. [Jane] scored in the average range on conventions and spelling speed, but was below average on spelling accuracy. Based upon the results of these assessments, [Jane's] score in one area, rapid naming, was 1.0 standard deviation below the mean . . . . On the TOWRE-2 . . . [Jane's] score on sight word efficiency was 100, which is average, and 95 on phonemic decoding efficiency, which was also in the average range. [On the] TOWL-4 . . . [Jane's] performance . . . ranged from average to superior. With the exception of spelling, which was her lowest score, in the 37th percentile, her remaining scores were on the high end of the average scale to superior. Her superior score was in spontaneous writing, where her composite score was in the 98th percentile. [Jane] was also given the WJ-III fluency tests . . . . [Jane's] reading and math fluency scores were in the average range, and her writing score was high average.

R. 164-166 (citations and footnote omitted).

2013). Jane's parents disagreed with this conclusion, and filed a due process complaint, resulting in a settlement agreement whereby Jane was allowed to retain her IDEA eligibility while the Does sought and obtained private academic and psychological evaluations. R. 167.

In February 2013, the Does retained Victoria Papageorge, an educational consultant and evaluator, to perform a private academic evaluation of Jane, and also retained Richard Doiron, Ph.D., a clinical neuropsychologist and licensed school psychologist, to perform a private psychological evaluation. R. 167-68. Papageorge administered many of the same academic tests that Cape Elizabeth had administered during Jane's triennial review, with Jane scoring noticeably lower on three of them: either below average or "low average" on the TOWRE-2, WRMT-III, and the GORT-5.[2] *Id.* Papageorge also administered the Symbol Imagery Test, which measures accuracy and efficiency in visual processing, on which Jane scored in the fifth percentile. *Id.* Papageorge concluded that Jane should still qualify for special education services and later testified at the Due Process Hearing (the "Hearing") that Jane demonstrated continued weaknesses with phonological processing, visual processing, and orthography, and required intensive remediation in reading fluency. R. 168, R. 1201-04.

---

[2] Jane's performances on the tests administered by Papageorge were as follows: on the TOWRE-2, Jane scored an 88, or 21st percentile, on sight word efficiency and an 87, or 19th percentile, on phonemic decoding. Her score on the WRMT-III was a 98, or 45th percentile. Her scores on the GORT-5 were in the "low average" range, with an oral reading "index" of 84, or 14th percentile. R. 167.

4

On Dr. Doiron's psychological evaluation, Jane scored in the average range to high average on most measures, with the exception of tests designed to measure "pseudoword decoding," oral reading fluency, spelling, and reading rate.[3] R. 168-69.

In March 2013, Papageorge and Doiron completed their evaluations. Before Doiron issued his report, Papageorge contacted Doiron and asked him to administer another test to Jane, the RAN/RAS. R. 170. Papageorge could not administer the test herself because she was not licensed to do so, and wrote to Doiron telling him that "if we don't have at least 2 scores of 85 or less or one of 78 . . . the school district is not going to accept that [Jane] has a learning disability, although our tests indicate otherwise." *Id.* Although Doiron had already completed his evaluation and had never administered the RAN/RAS test before, Doiron agreed to administer it to Jane. *Id.*

---

[3] The record describes Jane's performance on the tests administered by Doiron as follows:

> [Doiron] administered several tests, including the Children's Memory Scale [CMS]. [Jane] scored in the average range on all measures except visual immediate index, on which she scored in the high average range. On the attention/concentration index, [Jane's] scores increased from very low in 2007 (5th percentile) to average (42nd percentile) in 2013. Dr. Doiron also administered the WIAT-III. On the subtests, [Jane] scored above grade level and average or above (considerably above average on some tests) on most of the tests, except in her areas of weakness: pseudoword decoding (grade 6.2 or 34th percentile), oral reading fluency (grade 7.7 or 42nd percentile) and spelling (grade 7.5 or 32nd percentile). [Jane] also took the Nelson Denny Form G reading test, scoring in the solid average range on vocabulary and comprehension, but only in the seventh percentile on reading rate. The Nelson Denny reading rate test is a one-minute prompt, but it only counts number of words read, not accuracy . . . [Dr. Doiron] used this test because he believed it was more demanding than the WIAT-III in that it required the ability to read under time pressure more dense text information similar to what [Jane] would be reading in high school and college. Ms. Manuel testified that this test is not a measure of reading fluency, as there is no measure for accuracy, and as it is not a processing measure, it cannot be used to assess or diagnose processing disorders.

R. 168-69 (citations omitted).

He told Papageorge that he hoped they would obtain the scores they needed so that Jane would be identified as having a learning disability. *Id.* Instead, Jane performed well on the RAN/RAS, achieving scores in the average range.[4] *Id.*

Doiron issued his final evaluation report in April 2013, in which he diagnosed Jane with reading disorder dyslexia; attention deficit hyperactivity disorder, predominantly inattentive type; and adjustment disorder with anxiety secondary to her dyslexia. *Id.* Doiron's report made no mention of the fact that he had administered the RAN/RAS to Jane, or her scores. *Id.* Like Papageorge, he recommended specialized instruction in the area of reading fluency. R. 170-71.

Jane's IEP Team reconvened in May 2013 to review the competing public and private psychological and academic evaluations of Jane. R. 171. As in their January meeting, the IEP Team also discussed Jane's classroom progress and performance; the results of her most recent 2012 NWEA and 2011 NECAP tests, on which she met or exceeded grade level expectations for both reading and math; and input from Jane's parents and teachers. R. 1170-1175. The IEP Team memorialized its deliberations in a document called the "Written Notice," a copy of which was later sent to the Does. *Id.*

According to the Written Notice, the IEP Team heard presentations by Papageorge and Doiron in which they summarized the results of their respective academic and psychological evaluations. R. 1171. Doiron stated his opinion that Jane

---

[4] Jane's scores on the six RAN/RAS measures ranged from a "high average" measure on one test, to a score in the 37th percentile on another, and scores in the 65th to 82nd percentile on the remainder. R. 170.

6

is a student with a dyslexic profile who "developmentally can't process what she needs to academically at her grade level." *Id.* He did not disclose to the IEP Team that he had administered the RAN/RAS to Jane the previous month, or that Jane had achieved scores primarily in the average range.[5] *Id.* Papageorge discussed Jane's performance on the Symbol Imagery Test, and stated her opinion that Jane required specialized reading instruction. *Id.* The Does argued that Jane had a processing disorder based upon her below-average performance on three tests: the Symbol Imagery Test, the Test of Orthographic Competence ("TOC"), and the CTOPP. R. 172.

Manuel, the school psychologist, criticized the test results relied upon by the Does, stating that out of the three tests they cited, only the CTOPP measured psychological processing. *Id.* She also observed that Jane achieved scores in the average to high average range on all of the subtests that constitute the CTOPP except for one score in the low average range. R. 1171. *See also*, R. 172. Manuel stated further that there was no empirical evidence that the Symbol Imagery Test was a valid or reliable measure of Jane's reading ability, leaving only the TOC and CTOPP as evidence of a possible processing disorder. *Id.* These tests were only two out of the 48 administered, however, and Manuel explained that "she would not make a decision [about whether Jane qualified as a student with a learning disability] based upon two out of 48 tests." R. 172. Finally, Jane's language arts and social studies teacher, her math teacher, and her Spanish teacher each spoke very positively about her successful academic performance. R. 172-73.

---

[5] The record does reflect that Doiron did show Jane's RAN/RAS scores to Manuel. R. 172 n.7.

7

After discussing the psychological evaluations, the IEP Team concluded that Jane did not have a "processing disorder" as defined by MUSER because she did not score within the statistical range required by MUSER § VII.2.L(2)(a)(ii): 1.5 standard deviations below the mean in at least one area of psychological processing, or 1 standard deviation below the mean in two or more areas.[6] R. 1176.

The IEP Team also concluded that Jane was achieving adequately for her age and meeting State-approved grade-level standards in all areas, satisfying identical federal and state requirements contained in 34 C.F.R. § 300.309(a)(i) and MUSER § VII.2.L(2)(c)(i). The IEP Team based its conclusion upon a "compilation of data," which included: (1) the fact that Jane had received or was receiving 'A' grades in all of her classes for the last two academic trimesters as well as the current one; (2) her Winter 2013 NWEA scores in reading, which were in the 89th percentile; (3) her Fall 2012 NECAP scores in reading, which were "proficient/with distinction"; and (4) Jane's Fall 2012 Writing Benchmark, which produced scores of two (partially meeting standards) and three (meeting standards). R. 1171-72. The IEP Team also considered the results of the academic evaluations administered by Cape Elizabeth and Papageorge. *Id.*

The IEP Team's decision meant that Jane did not qualify as a student with a learning disability under the IDEA. The Does dissented and renewed their due

---

[6] The Written Notice states that the IEP Team based its conclusion in part on Manuel's psychological evaluation, which "yielded average range or higher scores in all areas being assessed with the exception of the Rapid Naming Composite on the CTOPP." R. 1171. The Written Notice also states that the IEP Team based its conclusion in part on Doiron's psychological evaluation, in which "[Jane's] performance on the Wisconsin Card Sort, CMS, Verbal Fluency Test and Rey Osterreith's Complex Figures Test revealed scores falling in at least the average range." *Id.*

8

process complaint shortly thereafter. The parties participated in a special education due process hearing pursuant to 20 U.S.C. § 1415 *et. seq.* and 20-A M.R.S. § 7207-B, over four days in July, August, and September 2013. ECF No. 27 at 7. In a comprehensive decision dated October 15, 2013, Hearing Officer Shari Broder, Esq. (the "hearing officer"), concluded that Cape Elizabeth did not violate the IDEA as a result of the IEP Team's determination. R. 187. She also determined that Cape Elizabeth's psychological and academic evaluations of Jane were appropriate under the IDEA and that the Does were not entitled to reimbursement for the Papageorge and Doiron evaluations they had obtained in preparation for the IEP Team meeting. *Id.*

The Does filed their appeal of the hearing officer's decision in this court on November 4, 2013. ECF No. 1. The parties participated in an oral argument regarding their respective memoranda of law on November 20, 2014. ECF No. 32.

## II. LEGAL STANDARD

### A.  IDEA

The IDEA, 20 U.S.C.A. § 1400 *et seq.* (2014), is a landmark federal statute which Congress enacted twenty-five years ago in order to "offer[] federal funds to states that agree to provide protections to make sure disabled children receive a free appropriate public education." *South Kingston Sch. Comm. v. Joanna S.*, 2014 WL 6892132, *1 (1st Cir. Dec. 9, 2014) (internal quotation marks omitted).

In order to provide a free appropriate public education, a school must create and then follow an "individualized education program" ("IEP") for each disabled child.

9

*D.B. ex rel. Elizabeth B. v. Esposito*, 675 F.3d 26, 34 (1st Cir. 2012). The IEP is "a written statement for each child with a disability that is developed, reviewed, and revised" in accordance with the IDEA and which must include the following: a statement of the child's present levels of academic achievement and functional performance; a statement of measureable annual goals; criteria for measuring progress toward those goals; and a statement of the specific services that the school will offer. 20 U.S.C.A. § 1414(d)(1)(A)(i) (2014).

The Act imposes additional procedural and substantive requirements with regard to the IEP. *See Roland M. v. Concord School Comm.*, 910 F.2d 983, 987 (1st Cir. 1990). For example, parents have the right to be part of the IEP "team" along with the teachers and other educational professionals charged with formulating a child's particular IEP. 20 U.S.C.A. § 1414(d)(1)(B); *Lessard v. Wilton-Lyndeborough Coop. Sch. Dist.,* 518 F.3d 18, 23 (1st Cir. 2008). The purpose behind such procedural safeguards is to "guarantee parents both an opportunity for meaningful input into all decisions affecting their child's education and the right to seek review of any decisions they think inappropriate." *Pihl v. Massachusetts Dept. of Educ.*, 9 F.3d 184, 187 (1st Cir. 1993) (quotation omitted). Thus, in the event of a dispute between the school and the child's parents regarding the IEP, the parents have the right to demand a hearing by an impartial hearing officer. 20 U.S.C.A. § 1415(f)(1)(A), (B)(ii) (2014). A party dissatisfied with a hearing officer's decision may appeal to a state court or a U.S. District Court, which must (i) receive the records of the administrative proceedings; (ii) hear additional evidence at the request of a party; and (iii) grant

relief as it deems appropriate based upon the preponderance of the evidence. 20 U.S.C.A. § 1415(i)(2)(A), (2)(C).

A court's authority to grant relief under the Act "includes the power to order school authorities to reimburse parents for their expenditures on private school education for a child if the court ultimately determines that such placement, rather than a proposed IEP, is proper under the Act." *Pihl*, 9 F.3d at 188 (*quoting School Comm. of Town of Burlington, Mass. v. Dep't. of Educ. of Mass.*, 471 U.S. 359, 369 (1985)).

**B.  Standard and Scope of Review**

The District Court reviews the hearing officer's decision based on a preponderance of the evidence standard. 20 U.S.C.A. § 1415(i)(2)(C); *D.B.*, 675 F.3d at 35-36. The burden of proof rests on the party challenging the hearing officer's decision. *Hampton Sch. Dist. v. Dobrowolski*, 976 F.2d 48, 54 (1st Cir. 1992). "[T]he provision that a reviewing court base its decision on the 'preponderance of the evidence' is by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review." *Board of Educ. of Hendrick Hudson Central Sch. Dist., et. al. v. Rowley*, 458 U.S. 176, 206 (1982), *superseded by statute on other grounds*, *N.B. v. Hellgate Elementary Sch. Dist.*, 541 F.3d 1202, 1213 n.3 (9th Cir. 2008). The requirement that a reviewing court must "receive the records of the administrative proceedings" implies that "due weight shall be given to those proceedings." *Rowley*, 458 U.S. at 206 (quotation omitted). "Judges are not trained pedagogues, and they must accord deference to the state agency's

11

application of its specialized knowledge." *Lessard*, 518 F.3d at 24 (citing *Gonzalez v. P.R. Dept. of Educ.*, 254 F.3d 350, 352 (1st Cir. 2001)) (other citations omitted). Therefore, "the appropriate level of review by District Courts [is characterized] as 'involved oversight,' a standard which falls somewhere between the highly deferential clear-error standard and the non-deferential de novo standard." *South Kingston Sch. Comm.*, 2014 WL at *4 (quoting *Sebastian M. v. King Phillip Reg'l Sch. Dist.*, 685 F.3d 79, 84 (1st Cir. 2012)) (quotation marks and additional quotation omitted).

### III. LEGAL ANALYSIS

In order to receive special education services under the IDEA, a student must qualify as a "child with a disability." 20 U.S.C.A. § 1401(3)(A)(i) (2014). *See also, Mr. I. ex rel. L.I. v. Maine Sch. Admin. Dist. No. 55*, 480 F.3d 1, 4-5 (1st Cir. 2007). The statute lists the qualifying disabilities, *see* § 1401(3)(A)(i), which are defined in the Code of Federal Regulations ("CFR"). The disability at issue in this case is a "specific learning disability" based on a psychological processing disorder:

> [A] disorder in one or more of the basic psychological processes involved in understanding or in using language, spoken or written, that may manifest itself in the imperfect ability to listen, think, speak, read, write, spell, or to do mathematical calculations, including conditions such as perceptual disabilities, brain injury, minimal brain dysfunction, dyslexia, and developmental aphasia.

34 C.F.R. § 300.8(c)(10)(i).

To determine whether a student has a specific learning disability, her IEP Team must examine two criteria: first, whether she achieves adequately for her age or meets State-approved grade-level standards in one or more of eight specified areas, including "reading fluency," 34 C.F.R. § 300.309(a)(1)(i)-(viii) (2014); and second,

whether she exhibits a pattern of strengths and weaknesses in performance, achievement, or both, relative to her age.[7] 34 C.F.R. § 300.309(a)(2) (2014).

Maine's special education regulation, the MUSER, contains the same requirement and uses the same language as the federal regulation. MUSER § VII.2.L(2)(c)(i). The MUSER also contains a separate, additional provision not found in the federal regulation. This additional provision states that an IEP Team may not determine that a student has a specific learning disability unless she has taken a peer-reviewed, scientifically-documented test of psychological processing and scored 1.5 or more standard deviations below the mean in one area of psychological processing, or 1.0 standard deviation or more below the mean in two areas of psychological processing. MUSER § VII.2.L(2)(a)(ii) (the "empirical proof requirement" or "section (a)").

## A. Plaintiffs' Objections to the Hearing Officer's Decision

### (1) Psychological Processing Disorder

The Does argue that the Hearing Officer should have concluded that Jane had a psychological processing disorder in the area of reading fluency based upon two tests administered by Papageorge: the Nelson Denny reading test and the GORT-5. ECF No. 26 at 26-28. They claim that the Hearing Officer improperly ignored these "unusually low" test scores and instead relied on Jane's grades and "passing scores on some standardized tests" in reaching her conclusion. *Id.*

---

[7] The second criterion, set forth in § 300.309(a)(2), is not at issue in this case. ECF No. 26 at 18 ("This element has been established by a consensus of Jane's IEP Team, so it is not at issue in this case.").

13

In fact, the Hearing Officer did consider Jane's poor performance on the Nelson Denny and GORT-5 tests, but she explicitly gave less weight to the results from Papageorge's evaluation because Papageorge "is not licensed or certified to diagnose processing disorders or to evaluate them."[8] R. 183. And while Jane's parents criticize the Hearing Officer for considering Jane's good performance on the NWEA and NECAP tests, they fail to note that earlier in her decision, the Hearing Officer also considered "31 subtests of processing abilities, including in areas of [Jane's] historical weakness, all but two [of which] . . . produced a score in the average or high average range." R. 182.

More broadly, the Does' argument that the Hearing Officer "veered off course into a consideration of Jane's academic grades . . . and scores on Maine standardized tests that do not measure reading fluency at all" is unsupported by any legal authority and conflicts with the federal regulation and its state counterpart, MUSER § VII.2.L(2)(c)(i).[9] *See* ECF No. 26 at 27. Because § 300.309(a) and MUSER § VII.2.L(2)(c)(i) both assign to the IEP Team the task of determining whether a student "achieves adequately" for her age or meets "State-approved grade-level standards," consideration of grades and state standardized test scores is appropriate. In fact, given that it is the hearing officer's role to review and analyze the work of the IEP Team, it is unclear how she could avoid an analysis that included the student's

---

[8] The Hearing Officer also gave less weight to Doiron's testimony after finding that he undermined his own credibility by withholding the RAN/RAS results from the IEP Team.

[9] The lone citation in this section of the Does' brief is to an eight year-old entry in the Federal Register which does not mention the appropriateness or inappropriateness of considering a student's grades and standardized test scores. *See* ECF No. 26 at 27 (citing 71 Fed. Reg. 46,652 (August 14, 2006)).

grades and state standardized test scores as part of the student's record as a whole. *See J.B. v. Wells-Ogunquit Cmty. Sch. Dist.*, 2014 WL 4100903, *10-11 (D. Me. Aug. 18, 2014).

The Does also argue that they produced sufficient evidence that Jane suffers from an orthographic processing disorder to satisfy the Maine empirical proof requirement. ECF No. 26 at 24. They cite Jane's scores on three tests administered by Papageorge as part of her academic evaluation: the Symbol Imagery Test, the CTOPP, and the Test of Orthographic Competence, each of which fell either 1.5 standard deviations or 1.0 standard deviation below the mean. ECF No. 26 at 25-26. However, as the Hearing Officer noted and as discussed earlier, the Hearing Officer gave reduced weight to the results of Papageorge's academic evaluation because Papageorge is not licensed or certified to diagnose processing disorders or to evaluate them. R. 183; *see also, supra.* There was also testimony at the due process hearing that the Symbol Imagery Test and the Test of Orthographic Competence are not processing disorder assessments. R. 2084-2086. That leaves Jane's CTOPP score, which, by itself, does not satisfy the Maine empirical proof requirement. *See* ECF No. 26 at 25-26.

Finally, the Does and the school district disagree whether Jane performed adequately on reading fluency probes administered during Jane's ninth grade year by Cape Elizabeth and by Barbara Melnick of the Aucocisco School. The Does claim that Jane never achieved the desired rate of 150 words per minute on ninth grade-level reading materials, citing her fluency probe scores from September and October

15

2013 and January 2014, all of which were below 150.  ECF No. 26 at 29; ECF No. 12 at 10, ¶ 27.  Cape Elizabeth counters by citing Jane's scores from April, June, and August 2013, which were above 150.  ECF No. 27 at 30.  Each party insists that the respective scores it cites more accurately reflect Jane's abilities, while claiming that the scores cited by the other party are inaccurate, not appropriately "normed," not the correct grade level, were achieved only after extensive rehearsal, were withheld from evidence, etc.  *See* ECF No. 27 at 29 and ECF No. 28 at 7.  The reading fluency probes received scant consideration before the parties filed their memoranda of law: the Hearing Officer mentioned them only in passing, *see* R. 163, ¶ 25 and R. 174, ¶ 41, while the IEP Team did not cite fluency probes at all in either the May 2013 LD Document or the May 2013 Written Notice.

Based on the record before the court, I am ill-equipped to resolve the question of which reading fluency probes are more accurate, nor is it necessary for me to do so here.  Given that the IEP Team did not consider this measure, and the Hearing Officer gave no more than glancing consideration to it, the Does have not established that fluency probe scores improperly led Cape Elizabeth to determine that Jane does not qualify for special education services under § 300.309(a) and MUSER § VII.2.L(2)(c)(i).  I also conclude that the Does failed to establish by a preponderance of the evidence that the IEP Team or the Hearing Officer somehow ignored the correct fluency probe scores.

I therefore affirm the Hearing Officer's conclusion that Cape Elizabeth did not violate the IDEA when it determined that Jane does not qualify as a student with a

disability. The fact that the IEP Team based its analysis upon Jane's psychological and academic evaluations, her scores on state standardized tests, the testimony of her teachers, and her excellent grades, did not violate § 300.309(a) or the equivalent state regulation, MUSER § VII.2.L(2)(c)(i).

**(2) Maine's Empirical Proof Requirement**

The Does argue that the Hearing Officer erred by refusing to declare that section (a) of the MUSER (§ VII.2.L(2)(a)(ii)), is invalid and unenforceable because it requires empirical evidence of a psychological processing disorder independent from, and in addition to, the criteria listed in the federal regulation.[10] ECF No. 26 at 17. The Does assert that the empirical proof requirement "is found nowhere in federal law *and* has been disavowed by the [the U.S. Department of Education]." *Id.* at 22 (emphasis in original). They cite regulatory guidance issued by the Department which states that "it is not necessary for the [IEP Team] to demonstrate or measure the existence of a basic disorder in psychological processing in order to determine that a child has a specific learning disability." *Id.* at 20 (quoting *Letter to Kennedy*, 16 IDELR 1082 (OSEP, June 29, 1990); s*ee also, id.* (citing *Letter to Knewitz*, 213 EHLR 246 (OSEP, Aug. 3, 1989)). The Does note further that the Department of Education's *Letter to Hugo*, 62 IDELR 211 (OSERS Nov. 5, 2013), contains a discussion of MUSER § VII.2.L(2)(a)(ii), stating that the provision might conflict with federal special education regulations because requiring the use of a severe discrepancy between

---

[10] The Hearing Officer concluded in her decision that she lacked the authority to make a determination about the validity and enforceability of MUSER § VII.2.L(2)(a)(ii).

17

intellectual ability and achievement is not permitted under 34 CFR § 300.307(a)(1). *Id.* at 23.

Whatever the merits of this apparent discrepancy between MUSER's empirical proof requirement and the federal regulations, I conclude that I need not and, therefore, should not determine in this case whether the empirical proof requirement in MUSER § VII.2.L(2)(a)(ii) is unenforceable. The IEP Team's decision to deny Jane's eligibility for special education services did not turn solely upon whether she satisfied the empirical proof requirement. Even though her scores on her psychological evaluations fell within 1.5 standard deviations or 1.0 standard deviation below the mean in areas of psychological processing, and therefore would not have satisfied the MUSER requirement, the IEP Team also determined that Jane did not qualify as a child with a disability. As measured by the requirements of the federal regulations, the IEP Team reached this conclusion based on indicia showing that Jane was achieving adequately for her age and meeting State-approved guidelines—Jane's grades, standardized test scores, and teacher feedback. These findings were well-supported in the record, as evidenced by the Written Notice from the May 2013 IEP Team meeting. These indicia of Jane's better-than-adequate achievement for her age demonstrate that the federal requirements for establishing a specific learning disability were not met.

Should a future case arise in which a student, unlike Jane, is found to satisfy the federal criteria to be deemed a child with a disability, but is denied that status for failing to meet the separate MUSER empirical proof requirement, it would be

necessary and appropriate for me to rule on the validity of the latter. Because Jane was deemed ineligible under both the federal and Maine specific MUSER criteria, and the record amply supports the IEP Team's application of the federal criteria, I decline to resolve this important legal question in this case.

Accordingly, because the Hearing Officer's conclusion is independently supported by her findings and conclusion regarding the federal requirements, I affirm that conclusion and do not decide whether MUSER VII.2.L(2)(a)(ii) violates Federal law.

**(3) Reimbursement Issue**

Finally, the Does claim that they are entitled to be reimbursed in the amount of $2,970.00, representing the money they spent on the academic evaluation conducted by Papageorge and the psychological evaluation conducted by Doiron. ECF No. 26 at 35. They argue that Cape Elizabeth's December 2012 triennial reevaluation "lacked the appropriate breadth and depth required to identify the nature of Jane's processing deficit and its impact on her reading fluency ability." *Id.* at 33. The Hearing Officer determined that the Does were not entitled to reimbursement because, pursuant to 34 CFR § 300.305(b), Cape Elizabeth demonstrated at the due process hearing that its own evaluation of Jane was appropriate. R. 185-87 ("[the school district's] testing was more diverse and more objective than the tests conducted by Dr. Doiron and Ms. Papageorge.").

Having affirmed the Hearing Officer's conclusion that Cape Elizabeth complied with the requirements of § 300.309(a) when it determined that Jane did not qualify

19

as a child with a disability, I therefore also affirm the Hearing Officer's decision denying reimbursement for the cost of Papageorge's and Doiron's evaluations.

## IV. CONCLUSION

For the reasons discussed above, I conclude that Cape Elizabeth did not violate the IDEA when it determined in the spring of 2013 that Jane was no longer eligible to receive special education and related services pursuant to 34 CFR § 300.309(a), MUSER § VII.2.L(2)(c)(i), and MUSER § VII.2.L(2)(a)(ii). I also conclude that the Does are not entitled to reimbursement for the private academic and psychological evaluations they obtained in preparation for the May 2013 IEP Team meeting. Accordingly, the Hearing Officer's decision is **AFFIRMED**.

**SO ORDERED.**

Dated December 29, 2014             /s/ Jon D. Levy
                                                                 U.S. DISTRICT JUDGE